**Betty Braaten FLOOD, Appellant,**

v.

**Gerald C. BRAATEN, Appellee.**

**No. 82–5765.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) July 21, 1983.

Decided Jan. 31, 1984.

As Amended Feb. 16, 1984.

Lomurro, Eastman & Collins, Freehold, N.J., for appellant; Donald M. Lomurro, Freehold, N.J., on brief.

Robert A. Alphson, Grand Forks, N.D., for appellee.

---

Before ADAMS and HIGGINBOTHAM, Circuit Judges, and TEITELBAUM, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Every year between 25,000 and 100,000 children of broken marriages are kidnapped [1] by a parent attempting forcibly to obtain custody over a child living with the other parent.[2] The emotional cost of this "child snatching"—which must be borne in large measure by young persons who have already watched their parents' marriage fail and their families split asunder—is overwhelming.[3] Yet only recently has this national tragedy received federal legislative attention. In 1980, Congress declared in the Parental Kidnapping Prevention Act (PKPA), P.L. 96–611, § 7, 94 Stat. 3568, that the "often inconsistent and conflicting" practices of the state courts that decide child custody disputes "contribute" to child snatching. 28 U.S.C. § 1738A note (Supp. V 1981). To correct the defects in the legal system that encourage parents to abduct their own children, Congress enacted standards governing state court recognition of child custody decrees from other states and state court assertion of jurisdiction to modify custody decrees from other states. See 28 U.S.C. § 1738A(a)–(g) (Supp. V 1981). The question raised by this appeal is whether the federal courts may exercise jurisdiction to enforce compliance with the provisions of the PKPA.

In the matter before us, the district judge apparently concluded that a federal court may never entertain such a claim under the

---

* Honorable Hubert I. Teitelbaum, United States District Court for the Western District of Pennsylvania, sitting by designation.

1. Strictly speaking, a parent who seizes his or her child in violation of a custody decree is not guilty of "kidnapping" as defined by the criminal law of most states. Nevertheless, the literature on parental abduction frequently refers to this conduct as "kidnapping" or "abduction." Where these terms appear in this opinion, they are used only in the non-technical sense that they have acquired in the area of child custody.

2. Parental Kidnaping Prevention Act of 1979, S 105: Joint Hearing Before the Subcomm. on Criminal Justice of the Senate Judiciary Comm. and the Subcomm. on Child and Human Development of the Senate Labor and Human Resources Comm., 96th Cong., 2d Sess. 10 (1980) (statement of Sen. Malcolm Wallop, sponsor). The Library of Congress estimates the lower figure, and Children's Rights, Inc. projects the higher one. *Id.*

3. For an excellent account of the child snatching problem, *see* S. Abrahms, Children in the Crossfire: The Tragedy of Parental Kidnaping (1983).

PKPA and summarily dismissed the complaint of Betty Braaten Flood even before an answer was filed. While the issue is not free from doubt, we cannot agree with the district judge that the PKPA can never support federal question jurisdiction in a lawsuit connected with a child custody dispute. Accordingly, we will remand for further proceedings.

## I.

The facts of this case are not atypical of the distressing circumstances that give rise to child snatching. We recount these facts in some detail because they illustrate the consequences of interstate jurisdictional conflict over the enforcement and modification of a child custody decree.

Betty Braaten Flood and Gerald Braaten were divorced in North Dakota on July 22, 1977. Originally, the divorce decree awarded custody of the four minor children of the marriage (Jim, Jason, Joel and Shawna) to Betty, but on August 24, 1979 the parties agreed to amend the custody arrangement. Under the amended arrangement, Betty was free to leave North Dakota with the children and Gerald had the right to custody of the children during the summer months of each year. While Gerald remained in North Dakota, Betty and the children moved to New York.

When the children returned to North Dakota to visit relatives during the 1979 Thanksgiving holiday, the custody battle commenced. Gerald obtained an ex parte order on December 4, 1979 awarding custody of the children to him.[4] On December 10, Betty managed to have the ex parte order rescinded, and regained custody of the children. She immediately returned to New York with the children and shortly thereafter moved to New Jersey.

A few weeks later,[5] a North Dakota district court ordered Betty to show cause why Gerald should not be awarded custody of the children. After a limited appearance by Betty's lawyer, the North Dakota court ruled on August 6, 1980, that custody of the four children should be transferred to Gerald. Over objection by Betty's lawyer, the North Dakota court decided without explanation that it had jurisdiction to order this modification of the custody decree.[6]

Four days later, Gerald seized two of the children in New Jersey (Joel and Shawna) and took them back to North Dakota.[7] Betty responded by filing a complaint with the New Jersey Superior Court, asking that custody of the four children be awarded to her. Shortly thereafter, on November 6, 1980, Betty returned to North Dakota and filed a motion requesting that the North Dakota custody decree be modified to give her custody of the four children once again. On that same day, Betty tried to abduct Joel and Shawna. Although her attempts to regain Shawna failed, she successfully removed Joel from North Dakota and returned to New Jersey with him.

After eleven more months of legal maneuvering by the parents, the New Jersey court ruled that it had jurisdiction to modify the custody decree. In its September 23, 1981 opinion, the court held that New Jersey was the proper forum to resolve the custody dispute under the Uniform Child Custody Jurisdiction Act[8] and denied Ger-

---

**4.** At this point, Gerald was being represented by his new wife, Karen Braaten, attorney-at-law.

**5.** The North Dakota court first issued the show-cause order on January 15, 1980. But because this original order was not timely served on Betty, the court issued a new order on February 28, 1980.

**6.** Conspicuously absent from the decision is any reference to the North Dakota statutory provisions governing jurisdiction to modify a custody decree, 14 N.D.Cent.Code §§ 14–01 et seq. (1981). These code sections, by which

North Dakota incorporated the Uniform Child Custody Jurisdiction Act (UCCJA) into its statutory law, had been in effect since 1969. 9 U.L.A. 111 (1979).

**7.** Although New Jersey criminal charges based on this abduction were filed against both Gerald and his wife Karen, they were later dismissed.

**8.** 2A N.J.Stat.Ann. §§ 34–28 et seq. (West Supp.1981). New Jersey's enactment of the UCCJA has been in effect since 1979. 9 U.L.A. Supp. 15 (1983).

ald's attempt to have the North Dakota custody decree enforced.[9] Gerald sought to appeal this ruling, but neither the Appellate Division nor the Supreme Court of New Jersey granted him leave to appeal. Following investigation by the family services division of the state probation department, the New Jersey Superior Court awarded custody of the four children to Betty on March 15, 1982. Apparently inspired by this new custody decree, Betty travelled to North Dakota and unsuccessfully attempted to abduct Shawna on April 7, 1982.[10]

By late autumn 1982, this legal feud had reached an impasse. The courts of New Jersey and North Dakota each refused to enforce the custody decree of the other.[11] Each state had asserted jurisdiction over the matter and each persisted in awarding custody to the parent residing within its borders. Over a period of two-and-one-half years, Betty had been held in contempt by the North Dakota court at least three times, while Gerald had been held in contempt by the New Jersey court at least once. Moreover, both parents had been criminally charged for abducting their own children.

Seeking to end the stalemate, Betty filed a complaint in the United States District Court for the District of New Jersey on November 29, 1982. In her complaint she requested, first, a stay of all further state judicial proceedings between the parties pending the federal court's decision, and second, a federal court order enforcing the custody decree entered by the New Jersey court. The complaint asserted that federal jurisdiction existed under 28 U.S.C. § 1738A, the provision codifying the PKPA's rules for state court adjudication of custody cases. On the same day, November 29, 1982, the district court on its own motion dismissed Betty's complaint without prejudice for failure to state a basis of jurisdiction. That same day also, Betty filed a notice of appeal to this Court. Before us, she contends that the district judge erred in summarily dismissing her complaint.

## II.

Federal courts have traditionally avoided involvement in child custody disputes. It was, presumably, this tradition that persuaded the district judge to dismiss summarily as well as sua sponte Betty Flood's complaint. We must therefore begin our analysis by determining whether the doctrines supporting the general rule of abstention in custody matters also foreclose a federal court from exercising its power to enforce compliance with 28 U.S.C. § 1738A.[12]

At the outset of our analysis, we emphasize that we are considering only the most restricted role for federal courts under § 1738A. The issue before us is not whether federal courts can enter child custody decrees or even whether federal courts

**9.** The careful opinion of the New Jersey court presented four reasons why it should exercise jurisdiction over the custody decree for the Braaten children: first, when Betty's suit was commenced, the children had lived in New Jersey just three days short of the six months required to make it the "home state"; second, North Dakota had not been the childrens' "home state" within the past six months; third, the North Dakota court had awarded custody to Gerald without considering the pending New Jersey proceeding; and fourth, a New Jersey court could reconsider the custody decree in the "best interest" of the children.

**10.** Betty was arrested and charged with attempting to remove a child from the state in violation of a North Dakota custody decree. These criminal charges were subsequently dropped.

**11.** The North Dakota court did not formally announce its refusal to enforce New Jersey's decree until March 14, 1983.

**12.** Preliminarily, we address Mr. Braaten's contention that because he was never served process and because he lacks "minimum contacts" with New Jersey, the district court cannot assert jurisdiction over his person and our Court cannot hear the appeal before us. Whatever the merits of his objection to personal jurisdiction in the district court, an issue on which we intimate no view, Mr. Braaten's argument appears to misconceive the source of this Court's jurisdiction. The dismissal of Mrs. Flood's complaint is a final order of a district court, and that is sufficient to give us appellate jurisdiction over the matter. 28 U.S.C. § 1291 (1976).

should be generally available for interstate enforcement of custody decrees. Rather, we understand the question on this appeal to be considerably more narrow: if a state court does not comply with the mandates of § 1738A—whether by asserting jurisdiction over a child custody case in violation of § 1738A or by refusing to enforce another state's custody decree in violation of § 1738A—may a federal court ever be employed to correct such a violation of federal law?[13]

The main bar to federal jurisdiction in cases involving child custody has been the "domestic relations exception" to diversity jurisdiction. Since the early declaration in *Barber v. Barber,* 62 U.S. (21 How.) 582, 584, 16 L.Ed. 226 (1859), "disclaim[ing] altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony," federal courts have declined to assert diversity jurisdiction over actions for divorce, alimony, child support, child custody and other matters deemed to involve "domestic relations." *See Solomon v. Solomon,* 516 F.2d 1018, 1021–26 (3d Cir.1975); *Magaziner v. Montemuro,* 468 F.2d 782, 787 (3d Cir.1972); *Albanese v. Richter,* 161 F.2d 688, 689 (3d Cir.1947).[14] Child custody matters in particular were first brought within the scope of the domestic relations exception only in dictum. *In re Burrus,* 136 U.S. 586, 593–4, 10 S.Ct. 850, 852–3, 34 L.Ed. 1500 (1890). But in the *Albanese* decision, our Court squarely held that federal district courts may not exercise diversity jurisdiction over a suit to enforce a father's obligations to his child. 161 F.2d at 689. *See also Solomon, supra,* 516 F.2d at 1024–25.[15]

Although the domestic relations exception has often been criticized,[16] we have no occasion today to question its general viability. After more than a century of silence, Congress may be said to have acquiesced in this court-crafted exclusion of jurisdiction granted by the diversity statute, 28 U.S.C. § 1332 (1976). *See Solomon, supra,* 516 F.2d at 1025; *Phillips, Nizer, supra* note 14, 490 F.2d at 514. Nor do we have any need to define the scope of the amorphous term "domestic relations." For our purposes, it is sufficient to note that the domestic relations exception *per se* applies only to actions in diversity. *See* Wright, Miller & Cooper, *supra* note 14, § 3609 at 662. We find no cases declining federal jurisdiction on the basis of the domestic relations exception when a litigant has otherwise made out a well-pleaded and substantial complaint alleging federal subject matter jurisdiction.[17]

**13.** This appeal does not require us to resolve an "implied cause of action" issue. That issue arises when a statute grants an express cause of action to some litigant—usually a government agency—but is silent about a cause of action for other litigants. *See* cases cited in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 374–78, 102 S.Ct. 1825, 1837–39, 72 L.Ed.2d 182 (1982). By contrast, § 1738A makes no reference at all to causes of action.

**14.** *See generally Phillips, Nizer, Benjamin, Krim & Ballon v. Rosenstiel,* 490 F.2d 509, 513–14 (2d Cir.1973); *Spindel v. Spindel,* 283 F.Supp. 797, 799–812 (E.D.N.Y.1968); C. Wright, A. Miller, E. Cooper, Federal Practice and Procedure § 3609 (1975).

**15.** We do not read *Magaziner* to extend the domestic relations exception beyond the diversity cases treated by *Albanese* and *Solomon.* Rather, as one of three alternative grounds for its holding, *Magaziner* invokes the prudential concerns underlying the domestic relations exception as a consideration militating in favor of

*Pullman* abstention. 468 F.2d at 787. Such abstention, of course, is only temporary; it ends when the state law issue has been resolved. Thus *Magaziner* does not suggest that the domestic relations exception raises a bar to lawsuits premised on a jurisdictional statute other than 28 U.S.C. § 1332 (1976).

**16.** For a thoughtful and scholarly critique, see Judge Weinstein's opinion in *Spindel, supra* note 14, 283 F.Supp. at 806–811; *see also* Note, The Domestic Relations Exception to Diversity Jurisdiction: A Re-Evaluation, 24 B.C.L.Rev. 661 (1983).

**17.** To the extent that broad language in some cases suggests that the domestic relations exception is also applicable to federal question cases, such language simply reflects the fact that until recently neither the Constitution nor laws of the United States were seen as affecting the family unit. *See Solomon, supra,* 516 F.2d at 1024; *Hernstadt v. Hernstadt,* 373 F.2d 316, 317 (2d Cir.1967); *In re Burrus, supra,* 136 U.S. at 594, 10 S.Ct. at 853 (child custody is an

Viewed in this light, the domestic relations exception would not appear to preclude a federal question lawsuit seeking enforcement of § 1738A. To be sure, the prudential concerns underlying the exception also counsel against ready assumption of federal jurisdiction even when a substantial federal claim has been properly pleaded. But as a jurisdictional bar, the domestic relations exception does not apply to cases arising under the Constitution or laws of the United States.[18]

### III.

■ A second doctrinal bar to federal jurisdiction in family matters is more directly relevant to the case before us. Although federal courts have been willing, under the Constitution's Full Faith and Credit Clause, to enforce prior state court judgments involving domestic relations matters, they have specifically declined to extend this constitutional provision to child custody decrees. Thus we must consider whether the logic of these decisions also precludes federal courts from enforcing compliance with § 1738A.

A judgment that is final and therefore res judicata in the courts of one state ordinarily must be given full faith and credit by all other courts in the United States. U.S. CONST. ART. IV, § 1; 28 U.S.C. § 1738 (1976). On this basis, the Supreme Court has made it clear that a federal court may decide whether a state judgment involving domestic relations is enforceable, while not becoming enmeshed in the factual details of the underlying dispute. *Williams v. North Carolina,* 325 U.S. 226, 232–33, 65 S.Ct. 1092, 1096–97, 89 L.Ed. 1577 (1945); *see also* Wright, Miller, Cooper, *supra,* § 3609 at 671–2, and 672 n. 22 (1975). Thus federal courts have declared the enforceability of divorce decrees, annulments, and alimony awards, but at the same time have avoided decision on the underlying issue. *Sutton v. Lieb,* 342 U.S. 402, 72 S.Ct. 398, 96 L.Ed. 448 (1952); *Williams v. North Carolina,* 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942); *Barber v. Barber,* 323 U.S. 77, 65 S.Ct. 137, 89 L.Ed. 82 (1944).

■ Under full faith and credit principles, however, enforcing a child custody decree presents unique problems. The special character of a custody decree results from the fact that it can be, and frequently is, modified if changed circumstances demonstrate that a modification would be in "the best interests" of the child. *See Ford v.*

---

issue "in regard to which neither the Congress of the United States nor any authority of the United States has any special jurisdiction"). Given that the Supreme Court has twice heard appeals from divorce decrees adjudicated in territorial courts, *see Simms v. Simms,* 175 U.S. 162, 20 S.Ct. 58, 44 L.Ed. 115 (1899); *De la Rama v. De la Rama,* 201 U.S. 303, 26 S.Ct. 485, 50 L.Ed. 765 (1906), and that in the 1970's the Supreme Court increasingly recognized that federal constitutional rights permeate state family law, *see Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Developments in the Law: The Constitution and the Family, 93 Harv.L.Rev. 1156 (1980), it would be difficult to maintain that the domestic relations exception extends to all sources of federal jurisdiction. *See also Lehman v. Lycoming Co. Children's Services,* 648 F.2d 135, 147 n. 5 (3d Cir.1981) (Adams, J., concurring) ("Neither *Burrus* nor *Solomon* involved a federal claim or constitutional question"), *aff'd,* 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).

**18.** We note that the issue before us today is entirely different from that resolved by *Lehman*

*v. Lycoming Co. Children's Services,* 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982). There the Supreme Court held that a habeas corpus petition under 28 U.S.C. § 2254 (1976) could not be used to attack collaterally a state decree awarding custody of the petitioner's natural children to foster parents. The Court based its decision on a construction of § 2254's words "in custody," reasoning that a foster child suffers no restraint different from a natural or adoptive child. 102 S.Ct. at 3237. Bolstered by principles of federalism and by the exceptional need for finality in child custody disputes, the Court concluded that child custody does not come within the scope of "custody" as used in § 2254. 102 S.Ct. at 3238–9. In the case before us, by contrast, the plaintiff does not seek to re-litigate a custody determination, but only to obtain an adjudication resolving which of two conflicting custody decrees was granted in conformity with § 1738A. Moreover, unlike the habeas statute considered in *Lehman,* there can be no question that § 1738A deals with child custody decrees, for it was specifically and exclusively enacted by Congress to regulate such matters.

*Ford,* 371 U.S. 187, 193–94, 83 S.Ct. 273, 276–77, 9 L.Ed.2d 240 (1962); *New York ex rel. Halvey v. Halvey,* 330 U.S. 610, 612–15, 67 S.Ct. 903, 905–06, 91 L.Ed. 1133 (1947). Consequently, insofar as a custody decree is modifiable in the rendering state, full faith and credit principles also permit it to be modified in some other forum state. *Kovacs v. Brewer,* 356 U.S. 604, 607, 78 S.Ct. 963, 965, 2 L.Ed.2d 1008 (1958); *Halvey, supra,* 330 U.S. at 614–15, 67 S.Ct. at 905–06. Thus, before a federal court can determine that full faith and credit principles have been violated, it will in many instances have to consider whether circumstances have in fact changed sufficiently to justify modification of the decree. In so doing, the federal court would ineluctably be drawn into re-adjudicating the underlying custody dispute. Therefore, even though the Supreme Court has reserved the question whether full faith and credit principles apply at all to custody decrees, *see Ford, supra,* 371 U.S. at 192, 83 S.Ct. at 276; *Kovacs, supra,* 356 U.S. at 607, 78 S.Ct. at 965; *May v. Anderson,* 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); *Halvey, supra,* 330 U.S. at 615–16, 67 S.Ct. at 906,[19] the modifiability of custody decrees makes it unlikely that a litigant could properly allege a federal claim for outright enforcement of a custody decree under the Full Faith and Credit Clause or statute.

The modifiability of custody decrees does not, however, hold the same implications for a law suit based on § 1738A. This provision is not a flat statutory extension of full faith and credit principles to child custody decrees. Rather, § 1738A defines a different basis for reciprocal enforcement of custody decrees. Unlike the more general command of the Constitution, which has been interpreted by Congress in § 1738 to require only that state judgments "shall have the same full faith and credit in every court . . . as they have . . . in the courts of [the rendering] state," § 1738A imposes a less flexible rule:

> (a) The appropriate authorities of every State shall enforce according to its terms . . . any child custody determination made consistently with the provisions of this section by a court of another state.

228 U.S.C. § 1738A(a) (Supp. V 1981).[20] Also, unlike the Constitution and § 1738, which leave to the state courts the determination of when they can or cannot assert jurisdiction to modify a decree,[21] § 1738A provides specific rules to determine the one state forum—be it the original custody-granting state, the "home state," or in limited circumstances, some other state—that can take jurisdiction to modify a custody decree. 28 U.S.C. §§ 1738A(c), (d) (Supp. V 1981). Finally, unlike the Constitution and § 1738, both of which are silent about con-

**19.** Twice in recent years the Supreme Court has avoided addressing the applicability of the Full Faith and Credit Clause or statute. In *Webb v. Webb, cert. dismissed,* 451 U.S. 493, 101 S.Ct. 1889, 68 L.Ed.2d 392 (1981), the Court reasoned that the state supreme court, 245 Ga. 650, 266 S.E.2d 463 (1980), had not clearly based its decision on the Full Faith and Credit Clause, and therefore dismissed for lack of a federal question. In *Eicke v. Eicke,* 399 So.2d 1231 (La.App.1981), *cert. granted,* 456 U.S. 970, 102 S.Ct. 2232, 72 L.Ed.2d 843 (1982), the Supreme Court originally agreed to hear an appeal from a Louisiana decision refusing to enforce a Texas custody decree. The dissent in the state court had argued that Louisiana was violating the Full Faith and Credit Clause by failing to recognize the Texas decree. Six months after granting certiorari, the Court requested supplemental briefs on the import of 28 U.S.C. § 1738A. 459 U.S. 1032, 103 S.Ct.

439, 74 L.Ed.2d 597 (1982). Before hearing argument, however, the Court dismissed the writ of certiorari as improvidently granted. —— U.S. ——, 103 S.Ct. 776, 74 L.Ed.2d 987 (1983).

**20.** The decree of another state may be modified by the enforcing state only if:
> (1) it has jurisdiction to make such a child custody determination; and
> (2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.

28 U.S.C. § 1738A(f) (Supp. V 1981).

**21.** Of course, this discretion is limited by Due Process constraints on state court assertion of personal jurisdiction. *Kulko v. Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978).

current proceedings on the same matter, § 1738A mandates that a state court

shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination.

28 U.S.C. § 1738A(g) (Supp. V 1981).

Because § 1738A permits only one state at a time to assert jurisdiction, a federal court could in certain cases enforce a decree without becoming enmeshed in the underlying custody dispute. For under the rules defined by § 1738A, if two states concurrently render custody decrees, one state has asserted jurisdiction in violation of federal law. Identifying that errant state under § 1738A requires only preliminary inquiry into jurisdictional facts. Unlike the task of a federal court contemplating enforcement of a custody decree under the Full Faith and Credit Clause or statute, determining whether a state has improperly taken jurisdiction under § 1738A need not implicate a federal court in questions of "changed circumstances" and modifiability. Rather, § 1738A defines rules specifically tailored to the unique problems of custody decrees, and thereby eliminates the old obstacles to federal court enforcement of such decrees when non-enforcement results from violation of § 1738A.

## IV.

Given that the traditional doctrinal bars to federal involvement in child custody disputes do not apply to a suit under § 1738A, the key issue remaining is whether Congress intended federal courts to have jurisdiction to enforce compliance with that provision. The language of § 1738A lends no direct assistance. It does not mention federal court jurisdiction, but neither does it prohibit federal jurisdiction. The legislative history of § 1738A does, however, provide some—though not conclusive—indication of Congress' intent. While it is clear that Congress did not want federal courts

making custody determinations, and while it is also clear that Congress did not want federal courts enforcing custody decrees in the first instance, it is nevertheless apparent that Congress meant to create new federal law governing state court enforcement and modification of custody decrees. By enacting one set of rules binding all the states, Congress sought to eliminate the inconsistency and close the loopholes that encouraged child snatching under the old system in which each state exercised unreviewable power to modify decrees. Absent some tribunal capable of enjoining violations of the strict and uniform requirements of § 1738A, the Congressional policy underlying the enactment would be thwarted.

The legislative history of § 1738A demonstrates that Congress intended custody determinations to remain in the hands of the state courts. See *Joint Hearings, supra* note 1, at 19–20 (testimony of Cong. Duncan) ("we hold Federal interference to the minimum"); *id.* at 71 (testimony of A. Miller, Pres. of Children's Rights, Inc. and supporter of bill) ("We do not want the Federal Government settling custody disputes."); *id.* at 133 (testimony of R. Coombs, Professor of Law); *Hearings on Parental Kidnapping Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 96th Cong. 2d Sess. 7 (testimony of Cong. C. Bennett, sponsor); *see also Bennett v. Bennett,* 682 F.2d 1039, 1041 (D.C.Cir.1980).

Section 1738A's legislative history also indicates that Congress rejected the idea that federal courts be called upon in the first instance to enforce a state court's child custody decree. The House committee considered an alternative proposal, H.R. 325 by Congressman Hamilton Fish, that would have statutorily overruled the domestic relations exception to diversity jurisdiction insofar as it applies to child custody decrees. *See Hearings Before the House Crime Subcomm., supra,* at 8–11. Drafted as an amendment to § 1332, Congressman Fish's proposal would have permitted parents to enforce child custody decrees in the federal courts without regard to the $10,000 jurisdictional amount. Rejection of this bill

shows that Congress wished to prevent the federal district courts from becoming a forum of first resort when an out-of-state parent disregards a custody decree.

Even so, it is also clear that Congress sought a major, federally mandated change in the old state law approach to custody jurisdiction. By 1978, when § 1738A was first drafted,[22] only 19 states had adopted the Uniform Child Custody Jurisdiction Act (UCCJA), a model statute establishing jurisdictional rules similar to those of § 1738A. *See* 9 U.L.A. 111–170 (1979). So long as a significant number of states failed to adopt the UCCJA, its usefulness was limited.[23] The Congressional sponsors of § 1738A believed that the need for nationwide uniformity in the rules of custody jurisdiction justified exercising federal power to compel interstate cooperation. *See Parental Kidnaping, 1979: Hearing Before the Child and Human Development Subcomm. of the Senate Labor and Human Resources Comm.,* 96th Cong., 1st Sess. 167 (1979) (statement of Sen. Wallop, sponsor);[24] *Joint Hearings, supra* note 1, at 4 (statement of Sen. Cranston, co-sponsor);[25] *id.* at 20 (statement of Cong. Duncan).[26] But Congress did not

---

**22.** *See* Coombs, Interstate Child Custody: Jurisdiction, Recognition and Enforcement, 66 Minn.L.Rev. 711, 720 n. 59 (1982).

**23.** The UCCJA was drafted in 1968 particularly because of the "chaos" generated by inconsistent state law governing custody jurisdiction. But during the 1979–80 congressional hearings on the PKPA, the situation was little different from that described by the National Conference of Commissioners on Uniform Laws when they first proposed the UCCJA over a decade earlier:

> [T]he courts of the various states have acted in isolation and at times in competition with each other; often with disastrous consequences. A court of one state may have awarded custody to the mother while another state decreed simultaneously that the child must go to the father.
> ... In situations like this the litigants do not know which court to obey. They may face punishment for contempt of court and perhaps criminal charges for child stealing in one state when complying with the decree of the other. Also, a custody decree made in one state one year is often overturned in another jurisdiction the next year or some years later and the child is handed over to another family, to be repeated as long as the feud continues....
> To remedy this intolerable state of affairs where self-help and the rule of "seize-and-run" prevail rather than the orderly processes of the law, uniform legislation has been urged in recent years to bring about a fair measure of interstate stability in custody awards....
> The Act is designed to bring some semblence of order into the existing chaos.

9 U.L.A. 113–14 (1979) (citations omitted).

**24.** Senator Wallop noted that:

> Because the UCCJA is a reciprocal act and may be freely adopted or rejected by the states, its effectiveness in interstate custody cases depends upon its adoption throughout the country. Although the trend is clearly in this direction, (as of the end of April, 1979, 32 states have adopted the UCCJA) it may be years before this is accomplished.
> The price of waiting for this eventuality is too high in human terms for Congress not to take initiative in finding a solution to the interstate child-snatching problem.

*See also Joint Hearings, supra* note 1, at 133 (testimony of R. Coombs, former legislative aid to Sen. Wallop):

> [T]he Uniform Act is being variously interpreted and applied by the States. The resulting problem will continue to exist unless the key concepts of the Uniform Act are, as is done in S. 105, made matters of Federal law so that the mechanism exists to see that the interpretation on the key points do become consistent.

**25.** Senator Cranston explained:

> Although legal custody issues relating to divorce and child-custody matters have traditionally been within the domain of the States and not the Federal Government, it is within the province of the Federal Government to resolve problems that are interstate in origin and which the States, acting independently, seem unable to resolve....
> The peculiar interstate ... nature of child snatching and the inherent difficulties of individual States in dealing with problems that transcend State boundaries has resulted in recent years in attention being directed at this problem at the Federal level.

**26.** Congressman Duncan stated:

> Though I would prefer to have this question addressed at the State level, it has not been. For this to happen would require all 50 States to subscribe to the interstate compact, both in letter and spirit, and make it impossible for any parent to find a safe haven to harbor a child taken contrary to a court order across a State line. I don't believe we can except [sic] this level of cooper-

simply enact the UCCJA into federal law. Instead, it eliminated the gaps in the UCCJA which, under some circumstances, permitted more than one state at a time to exercise jurisdiction over a custody decree. *See* Coombs, *supra* note 22, at 771–88, 834–46; Note, *The Search for a Solution to Child Snatching,* 11 Hofstra L.Rev. 1073, 1101–06 (1983). Thus Congress instituted a new concept of custody jurisdiction. Had it wanted to leave compliance with these stricter provisions to the unpoliced discretion of the states, it is doubtful whether it would have acted at all.[27]

Another option is of course available. Litigants who have exhausted their state remedies could appeal directly to the United States Supreme Court from the state supreme court that they contend has violated § 1738A. Although this approach arguably might have been effective in an earlier period when the Supreme Court's docket was less crowded, we are not persuaded that the Supreme Court now has the resources effectively to ensure compliance with § 1738A. Since there are scores of interstate custody disputes each year, limiting litigants to direct appeals to the United States Supreme Court would, for all practical purposes, deny them a forum to remedy transgressions of § 1738A.

We cannot believe that Congress intended to render § 1738A virtually nugatory by so restricting the availability of a federal forum that state compliance with the legis-lation would become optional. Rather, we are persuaded that in limited circumstances of noncompliance with § 1738A,[28] federal district court intervention is permissible. In § 1738A, Congress unequivocally and mandatorily imposed federal duties on the states—"The appropriate authorities of every state shall enforce .... " The general grant of subject matter jurisdiction, 28 U.S.C. § 1331 (Supp. V 1981), permits federal district courts to hear claims that federal rights have been infringed. Altogether denying parents a district court forum for lawsuits claiming violation of rights under § 1738A would come close to a judicial repeal of those statutory rights. "To take away all remedy for the enforcement of a right is to take away the right itself." *Poindexter v. Greenhow,* 114 U.S. 270, 303, 5 S.Ct. 903, 921, 29 L.Ed. 185 (1885).

### V.

Since *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), it has been clear that a complaint should not be dismissed for lack of jurisdiction unless the federal claim is "wholly insubstantial and frivolous." As we understand § 1738A and the unanswered allegations in Betty Flood's complaint, we cannot say that plaintiff's invocation of the power of a federal court is "so patently without merit as to justify ... dismissal for want of jurisdiction." *Id.* at 683, 66 S.Ct. at 776. Mrs. Flood has alleged that North Dakota and New Jersey courts

---

ation. In one sense, we have an interstate compact already called the Constitution of the United States. We have an interstate compact commission called the Congress of the United States, and we can handle this problem here.

27. Although some language in *Bennett v. Bennett, supra,* 682 F.2d at 1042–44, suggests that Congress intended no role whatsoever for federal courts under § 1738A, we construe the *Bennett* holding more narrowly. In that case, a parent suing in diversity sought damages for his ex-spouse's tortious violation of a custody decree. *Bennett* permitted this claim to proceed in federal court, but held that an additional claim seeking injunctive relief from further tortious interference in the custody decree could not be heard by a federal court. In so holding, *Bennett* concluded that § 1738A did not legislatively alter the domestic relations exception to diversity jurisdiction so as to permit a federal court to issue the injunction requested by the plaintiff in that case. We do not believe that such a reading of § 1738A's legislative history can be applied to a suit predicated on federal question jurisdiction which seeks to enforce compliance with § 1738A itself.

28. One important question may have to be addressed in a subsequent case: whether a plaintiff, prior to invoking the power of a federal court, must exhaust state judicial remedies for the alleged noncompliance with § 1738A. Because the exhaustion issue is not squarely raised by today's appeal, which comes to us from a jurisdictional dismissal on the district court's own motion, we need not reach that question today.

have concurrently issued conflicting custody decrees. She has also alleged that she and her children are suffering irreparable harm from the lack of consistent custody decrees. Read sympathetically, Mrs. Flood's complaint describes a violation of rights protected by § 1738A: the right to have one state at a time determine her childrens' custody and the right to have other states enforce that determination unless modification is permitted by federal law. Thus we must conclude that the complaint sufficiently alleges an infraction of federal statutory rights so as to survive the district judge's own motion to dismiss for lack of jurisdiction.

The judgment of the district court dismissing the complaint will be vacated, and the matter remanded for a determination, after plaintiff has had the opportunity to amend her complaint, whether it properly states a cause of action arising under § 1738A.