**PILKINGTON BROTHERS P.L.C., Plaintiff,**

v.

**AFG INDUSTRIES INC., Defendant.**

**Civ. A. No. 83–561 MMS.**

United States District Court, D. Delaware.

Feb. 28, 1984.

Charles F. Richards, Jr., Richards, Layton & Finger, Wilmington, Del., for plaintiff; Joel M. Freed, and Joseph R. Magnone, Burns, Doane, Swecker & Mathis, Alexandria, Va., of counsel.

Stephen P. Lamb, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendants; John C. Dods, James T. Newsom, and Peter E. Strand, Shook, Hardy & Bacon, Kansas City, Mo., of counsel.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This is an action for declaratory and injunctive relief under 28 U.S.C. §§ 2201–02 (1976) with jurisdiction based upon diversity, and an application for an order confirming an arbitral award under 9 U.S.C. § 201 (1982). The Court has before it plaintiff's motion for a preliminary injunction and defendant's motion for summary judgment. The central issue embodied in those motions is one of first impression: whether an American court should issue a preliminary injunction duplicative of an ex parte interim injunction issued by a foreign court based solely on grounds of international comity and without regard to the merits of the underlying dispute. For reasons which follow the Court concludes that international comity does not require issuance of the requested preliminary injunction. As a consequence, summary judgment will be granted to defendant.

### I. *Background*

Plaintiff Pilkington Brothers P.L.C. ("Pilkington") is a British corporation with

its principal place of business in England. Defendant AFG Industries, Inc. ("AFG") is a Delaware corporation. Pilkington licensed to ASG Industries, Inc. ("ASG"), a predecessor to AFG, an interest in certain technology involved in making "float glass."[1] Its licensing agreements provide that disputes arising under the agreements should be arbitrated in London in accordance with English law. Arbitration, in fact, has for some time been proceeding in a dispute over the failure of AFG to make royalty reports and payments.

A more recently commenced second arbitration bears an immediate relationship to this action. Pilkington grew concerned that AFG was contemplating selling the float glass technology which is covered in its license agreements. Two events in particular gave rise to Pilkington's apprehension. First, AFG formed a new subdivision, AFG Technologies, Inc., which Pilkington believed AFG intended to use to export Pilkington's float glass technology world-wide. Second, AFG allowed representatives of a Portuguese company, Covina Companhia Vidreira Nacional SARL ("Covina"), to tour AFG's float glass plant.

This "Covina incident," Pilkington contends, violated AFG's licensing agreements. AFG admits that Covina officials toured its plant but denies that the incident violated its license agreements.

Pilkington brought its misgivings before an arbitration panel in England. On August 25, 1983, motivated by fears that its float glass technology would be exposed, Pilkington requested an interim injunction from the High Court of Justice, Queens Bench Division, Commercial Court, pursuant to section 12(h) of England's Arbitration Act of 1950.[2] The High Court held a hearing on August 26, 1983. Although Pilkington supplied AFG's London counsel with copies of its filings, counsel for AFG did not attend the hearing.[3] The High Court entered an *ex parte* order that same day restraining AFG from doing the following acts:

(a) from copying, reproducing, transmitting or communicating to any third party whomsoever and in particular to any director officer or employee of AFG Technologies Inc. who is not also an authorized person as defined in subparagraph (c) below any draw-

1. Float glass is a particular type of flat glass which, according to Pilkington, was "brought to commercial fruition in England by Pilkington as a result of considerable efforts spanning many years and involving expenditures of many millions of pound sterling...." (Doc. 22 at 7). The float glass technology, Pilkington asserts, "constituted a revolutionary development of the glass making art" with widely acknowledged international commercial significance. (*Id.*).

2. Section 12 of the Arbitration Act of 1950 provides in relevant part that, where proceedings have been referred to arbitration:
   (6) The High Court shall have, for the purpose of and in relation to a reference, the same power of making orders in respect of—
   (a) security for costs;
   (b) discovery of documents and interrogatories;
   (c) the giving of evidence by affidavit;
   (d) examination on oath of any witness before an officer of the High Court or any other person, and the issue of a commission or request for the examination of a witness out of the jurisdiction;
   (e) the preservation, interim custody or sale of any goods which are the subject matter of the reference;

(f) securing the amount in dispute in the reference;
(g) the detention, preservation or inspection of any property or thing which is the subject of the reference or as to which any question may arise therein, and authorizing for any of the purposes aforesaid any persons to enter upon or into any land or building in the possession of any party to the reference, or authorizing any samples to be taken or any observation to be made or experiment to be tried which may be necessary or expedient for the purpose of obtaining full information or evidence; and
(h) *interim injunctions* or the appointment of a receiver;
as it has for the purpose of and in relation to an action or matter in the High Court:
   Provided that nothing in this subsection shall be taken to prejudice any power which may be vested in an arbitrator or umpire of making orders with respect to any of the matters aforesaid.
(Doc. 1, Exhibit C) (emphasis added).

3. AFG contends that it had insufficient time to arrange for presence of counsel at the hearing. (See Doc. 11 at 11 and Exhibit 11).

ings, diagrams, manuals, memoranda or other technical documents whatsoever obtained by the Defendants from the Plaintiffs pursuant to the License Agreements referred to in paragraph 3 of this Order;

(b) from disclosing to any third party whomsoever and in particular to any director, officer or employee of AFG Technologies Inc. who is not also an authorized person as defined in subparagraph (c) below any technical information or know-how derived by the Defendants under the License Agreements referred to in paragraph 3 of this Order, whether contained in drawings, reproductions of drawings, written reports, letters, memoranda notes or in any other form whatsoever or acquired from observation of machines, processes or activities in plants of the Plaintiffs or otherwise howsoever;

(c) from causing or permitting the inspection of or access to such parts of the Defendants' production facilities in which the operations which are the subject matter of the License Agreements referred to in paragraph 3 of this Order are practiced or carried on by any person whomsoever except for authorized persons (that is to say, the Defendants' own employees actually employed in such production facilities, the Defendants' own management, legal, supervisory, engineering, technical and research employees, the employees of suppliers and contractors employed to repair and maintain such production facilities, and duly authorized governmental and regulatory authority officials, from whom in each case a written undertaking of confidentiality in the form set out in the Fourth Schedule to each of the Li-

cense Agreements referred to in paragraph 3 of this Order has been obtained by the Defendants);

(Doc. 1, Exhibit F). The High Court extended to AFG the opportunity to "apply on 48 hours notice to the plaintiffs to vary or discharge" the Court's injunction. (*Id.*). AFG has, apparently, still not made such an application.[4]

## II. *Preliminary Injunction*

Plaintiff seeks a preliminary injunction from this Court that will exactly track the wording of the interim injunctive order issued by the English High Court of Justice. Plaintiff does not ask this Court to decide the merits of its underlying trade secret and contract dispute with defendant or to craft its own injunction based on that dispute. (*See* Doc. 29 at 31–32). Rather, relying solely on principles of international comity, plaintiff requests this American court to duplicate the English court's order because plaintiff fears that the English order affords it inadequate protection.

This Court earlier denied Pilkington's request for a temporary restraining order. The Court was not convinced that AFG would violate the High Court's order and therefore held that Pilkington failed to demonstrate irreparable injury. *Pilkington Brothers P.L.C. v. AFG Industries, Inc.*, No. 83–561 (D.Del. Sept. 12, 1983) (order denying temporary restraining order). For purposes of the present preliminary injunction motion and motion for summary judgment, the parties stipulated that AFG would violate the High Court injunction and cause irreparable harm to Pilkington.[5] The issue now before the Court is thus whether an American court must duplicate a foreign interim injunction, without reference to the underlying dispute, where there are ongoing and continuous violations of that foreign injunction.

---

**4.** By the date of oral argument on the motions now pending before the Court, December 2, 1983, AFG had still not contested the High Court's injunction and stated that it had no intention to do so as long as the arbitration proceedings were unfolding orderly. (Doc. 29 at 24–25).

**5.** AFG Industries has consistently maintained it will *not* violate the High Court order as interpreted by it, but entered into the stipulation to both avoid discovery and present a discrete legal issue.

I conclude that principles of international comity do not require, and in fact militate against, the issuance of a duplicative order that would interject this Court into the arbitration dispute now before the English courts and the English arbitration panel.

██ Unlike decisions by American courts, those issued by foreign jurisdictions are not entitled to automatic recognition or enforcement in the United States. Nonetheless, an American court will under principles of international comity recognize a judgment of a foreign nation if it is convinced that the parties in the foreign court received fair treatment by a court of competent jurisdiction "under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries...." *Hilton v. Guyot*, 159 U.S. 113, 202, 16 S.Ct. 139, 158, 40 L.Ed. 95 (1895); *see also Bata v. Bata*, 39 Del. Ch. 258, 163 A.2d 493 (1960); *Restatement (Second) of Conflict of Laws* § 98 (1971). As Judge Aldisert explained in *Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435 (3d Cir.1971), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1294, 31 L.Ed.2d 479 (1972):

> Comity is a recognition which one nation extends within its own territory to the legislative, executive, or judicial acts of another. It is not a rule of law, but one of practice, convenience, and expediency. Although more than mere courtesy and accommodation, comity does not achieve force of imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and the rights of persons protected by its own laws.

*Id.* at 440.

In the usual case parties seek enforcement in this country of foreign money judgments, not injunctive orders. According to the *Restatement (Second) of Conflict of Laws*, however, the principle of

international comity should not be limited to money judgments.[6] The *Restatement*'s authors reason that because American courts enforce injunctive decrees of sister states,

> [i]t can therefore be assumed that a decree rendered in a foreign nation which orders or enjoins the doing of an act will be enforced in this country provided that such enforcement is necessary to effectuate the decree and will not impose an undue burden upon the American court and provided further that in the view of the American court the decree is consistent with fundamental principles of justice and of good morals.

*Restatement (Second) of Conflict of Laws* § 102 comment g (1971). This Court has no reason to quarrel with the *Restatement*'s position. Nonetheless, plaintiff is not entitled to its requested relief.

The parties have extensively briefed the issue of whether the High Court's order is "final" for res judicata purposes and the issue of "reciprocity"—that is, the issue of whether an English court would recognize an American interlocutory injunction such as that issued by the High Court were the roles reversed. Neither of those issues, however, are of controlling significance.

██ First, the "reciprocity" doctrine does not govern this dispute. The reciprocity rule, first espoused by the United States Supreme Court in *Hilton v. Guyot*, 159 U.S. at 227, 16 S.Ct. at 167, has been applied to deny recognition to a foreign judgment if courts of the foreign nation would not accord recognition to a like judgment issued by an American court. *See* C. Peterson, *Foreign Country Judgments and the Restatement of Conflict of Laws*, 72 Colum.L.Rev. 220, 233–36 (1972); A. von Mehren & D. Trautman, *Recognition of Foreign Adjudications—A Survey and Suggested Approach*, 81 Harv.L.Rev. 1601, 1660–62 (1968). As a federal court operating under diversity jurisdiction, this Court

---

**6.** The *Restatement* cited only one case in support of this proposition. See *Restatement (Second) of Conflict of Laws* § 102, Reporter's Note to comment g, *citing* Roblin v. Long, 40 How.Pr. 200 (N.Y.1800).

must apply Delaware state law of international comity under the principles of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d at 440. *Restatement (Second) of Conflict of Laws* § 98 comment e; H. Smit, *International Res Judicata and Collateral Estoppel in the United States*, 9 U.C.L.A.L.Rev. 44, 48 (1962); Comment, 18 Colum.J.Transant'l L. 119, 127–28 (1979). In *Bata v. Bata*, 39 Del.Ch. 258, 163 A.2d 493 (1960), the Delaware Supreme Court refused to apply the reciprocity rule in an action brought by foreign citizens, explaining that the reciprocity rule announced in *Hilton* was "based on the desire to protect American nationals" and was "limited to cases in which it is invoked by an American citizen." *Id.* 163 A.2d at 505. The court further recognized that the reciprocity rule "has been severely criticized by commentators in the field of conflict of laws." *Id.* It is unclear whether the present action falls strictly within *Bata* because *both* Pilkington *and* AFG—a for-

eign corporation and a domestic corporation—are asserting protection of the reciprocity doctrine. Nonetheless, based on the Delaware Supreme Court's criticism of the rule in *Bata*, one can reasonably predict that Delaware would reject application of the reciprocity doctrine in this case. *See generally Johnston v. Compagnie Generale Transatlantique*, 242 N.Y. 381, 152 N.E. 121 (1926); R. von Mehren & M. Patterson, *Recognition and Enforcement of Foreign-Country Judgments in the United States*, 6 L. & Pol'y in Int'l Bus. 37, 47 (1974); R. Bishop & S. Burnette, *United States Practice Concerning the Recognition of Foreign Judgments*, 16 Int'l Law. 425, 435 (1962); W. Reese, *The Status in this Country of Judgments Rendered Abroad*, 50 Colum.L.Rev. 783, 791–92 (1950); H. Smit, *supra* p. 9, at 49–51; A. von Mehren & D. Trautman, *supra* p. 9, at 1662; *Restatement (Second) of Conflict of Laws* § 98 comment e; *cf. Somportex Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d at 440 n. 8.[7]

\* \* \* \* \* \*

We would agree that a *foreign interlocutory judgment is not final and conclusive on the merits and is therefore not capable of direct enforcement in England.*

\* \* \* \* \* \*

[T]he existence of an interlocutory injunction granted by a foreign court would be a *relevant factor* for an English court to *take only into account* in deciding whether to *exercise its discretion* in favour of granting its own injunction. The public policy in favour of *judicial comity would therefore be a factor* pointing towards the grant of an injunction by the English court.... Naturally, it is possible that in some cases other considerations (which might include competing claims of public policy) would point in the other direction, against an injunction being granted. The English court would then have to decide whether those other considerations either required it to refuse the injunction as a matter of law or outweighed the principle of comity as a matter of discretion.

(Doc. 28 at 2–4, 8, 9–10).

Thus, Pilkington's own experts agree that under British law a foreign interlocutory order like the one issued by the High Court would receive only persuasive effect in British courts, not preclusive effect.

7. Even were the reciprocity rule to apply in this case, affidavits of English counsel for both parties reveal that recognition of the High Court order would be inappropriate.

Bernard Anthony Rit and Stephen Martin Males, both English Barristers, submitted affidavits on behalf of Pilkington which, first of all, reflected a misunderstanding of plaintiff's proposed relief in this case and, secondly, demonstrated agreement with AFG's position that issuance of an identically worded order based solely on principles of comity would be improper:

English law rules as to recognition and enforcement in the strict sense of those terms are not relevant to Pilkington's application in this case because, *as we understand the matter, the American court is not being asked to recognize or enforce the English court order in that strict sense.* The rules as to recognition and enforcement in the strict sense are relevant in English law only when a party seeks to say that his opponent is *conclusively* bound in an English court by the decision of a foreign court, so that the party is *entitled as of right* to a judgment from the English court which is itself final.... However, in the present case *Pilkington does not suggest, as we understand the matter, that the English court's injunction deprives the American court of discretion* and as such is conclusory against AFG....

■■ The question of "finality" is likewise not dispositive. A generally recognized rule of international comity states that an American court will only recognize a final and valid judgment. *See* A. von Mehren & D. Trautman, *supra* p. 9, at 1657. That rule, however, has not been strictly applied to cases involving enforcement of modifiable judgments. Modifiable foreign orders can be granted extraterritorial effect even though they might not be "final" for purposes of res judicata. *See* A. von Mehren & D. Trautman, *supra* p. 9, at 1657–58; *Restatement (Second) of Conflict of Laws* § 109 comment d. Plaintiff does not ask this Court to give preclusive effect to a foreign judgment in the traditional sense of barring certain claims or issues from relitigation; rather, it asks the Court to domesticate an interim foreign order and give it the imprimatur of an American court. Under Delaware law a court has discretion[8] to enforce a modifiable equitable decree of another state, *see McElroy v. McElroy*, 256 A.2d 763, 766–67 (Del.Ch.1969), and the Court assumes that a Delaware court would similarly, in its discretion, enforce a modifiable decree of a foreign nation court.[9]

Most cases uncovered in research in which courts have enforced modifiable foreign injunctions involved child custody orders and divorce decrees, all of which were entered into after a full adjudication of the merits in the foreign courts and were modifiable only upon change in circumstances. *See generally* R. Bishop & S. Burnette, *supra* p. 10, at 430–31; R. von Mehren & M. Patterson, *supra* p. 10, at 70–71; H. Smit, *supra* p. 9, at 64–66. The equitable orders in these cases are, therefore, in some sense more "final" than the interlocutory injunction entered into in this case. The High Court order could thus be distinguished as merely an interim order, entered into in aid of arbitration, and not based on a full consideration of the merits of the underlying dispute. However, rather than create a *per se* rule against recognition and enforcement of foreign interim injunctions, the Court will analyze the particular facts of this case under general principles . of international comity. There may be a case, under different circumstances, in which a foreign nation "interim" injunction could be recognized.

■■ On the facts of this case it would be inappropriate to enter into Pilkington's

---

**8.** It is the general view that equitable orders subject to modification by the issuing court are not entitled to automatic recognition in another state under the full faith and credit clause. *See McElroy v. McElroy*, 256 A.2d 763, 766 (Del. Ch.1969); *Restatement (Second) of Conflict of Laws* § 109 & comment c; *cf. Flood v. Braaten*, 727 F.2d 303, 308–309 (3d Cir.1984).

**9.** Delaware courts are by statute entitled to recognize and enforce custody decrees of foreign nations. Under the Uniform Child Custody Jurisdiction Act, 13 *Del.C.* § 1901–25 (1981), Delaware Courts will "recognize and enforce an initial or modification decree of a court of another state ...," 13 *Del.C.* § 1913, and, if Delaware Courts have jurisdiction, they are entitled to modify a custody decree of another state. 13 *Del.C.* § 1914. Section 1923 of the Act provides that:

The general policies of this chapter extend to the international area. The provisions of this chapter relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody institutions rendered by appropriate authorities of other nations, if reasonable notice

and opportunity to be heard were given to all affected parties.

13 *Del.C.* § 1923.

The Uniform Reciprocal Enforcement of Support Act, 13 *Del.C.* § 601–639 (1981), similarly allows criminal or civil enforcement of support orders of "any state, territory or possession of the United States and the District of Columbia in which this or a substantially similar reciprocal law has been enacted, including any province or territory of the Dominion of Canada *or any foreign country.*" 13 *Del.C.* § 602 (emphasis added).

At least one state court held, prior to adoption of any Uniform Acts, that it could enforce a foreign decree that was subject to modification in a foreign court on the condition that the order entered into in the United States would also be subject to modification. *See Herczog v. Herczog*, 186 Cal.App.2d 318, 9 Cal.Rptr. 5 (1960); *see also* C. Peterson, *supra* p. 9, at 261; H. Smit, *supra* p. 9, at 64–65.

28 U.S.C. § 1738A, enacted in 1980, Pub.L. No. 96–611, 94 Stat. 3569 (Dec. 28, 1980), now imposes a nationwide practice of enforcement of child custody decrees rendered by states, territories and possessions of the United States, similar to that of the Uniform Child Custody Act.

requested relief. By issuing an identically worded injunction while arbitration is still proceeding under the watchful jurisdiction of the English High Court, this Court would offend, rather than promote, principles of international comity. For were this Court to issue Pilkington's requested relief, it would interfere unnecessarily in those foreign proceedings—proceedings in which Pilkington agreed by contract to participate.[10] For example, upon a future application to this Court for a sanction against violations of its order, this Court would be compelled to interpret and apply an injunction which was drafted by the English High Court in furtherance of the High Court's special role under the English Arbitration Act.[11] This might lead to inconsistent interpretations and inconsistent enforcement. Any interpretation of the High Court's order should be made by that court, not a United States district court. In addition, the existence of two identical outstanding injunctions could lead to a race to that courthouse which is perceived by each party as the more favorable forum. Finally, modifications of an injunction in one jurisdiction could lead to confusion and procedural tangles in the other jurisdiction. It is far simpler to have one court receive all applications for modifications.

Pilkington argues that without an order by this Court it will have no effective means of persuading AFG to obey the High Court order. An order of this Court is required, asserts Pilkington, to give teeth to the High Court order. The English remedies of "sequestration" and "committal," Pilkington explains, are not enforceable in the United States: sequestration is available only if AFG or its officers have property in England (Doc. 22 at 32); likewise,

committal can result in imprisonment of AFG officers only if they enter the United Kingdom. (*Id.* at 32–33).

Penalties are, however, available against AFG. Pilkington concedes the High Court may impose a fine against AFG if it violates the Court's injunction (Doc. 22 at 33; Affidavit of B. Rit and S. Males, Doc. 23 at A–46, 47). The threat of this sanction is a deterrent to AFG. The Court leaves for another day the question of whether insufficient enforcement mechanisms in a foreign jurisdiction of a litigant's choice would ever constitute grounds for issuing a duplicative interim injunction at the behest of the same litigant.

### III. *Summary Judgment*

Defendant is entitled to summary judgment on both of Pilkington's claims. Claim one seeks "a prompt declaration of [Pilkington's] rights under the High Court's Order, and an order of this Court which will carry the High Court's Order into effect in the United States of America...." (Doc. 1 at 10). As explained above, the Court will not interject itself into the English proceedings by assaying its own interpretation of the High Court order. It is thus inappropriate to issue any declaration of Pilkington's rights under the High Court injunction.

Claim two asks for an "order confirming the High Court's Order as an arbital award against Defendant under Title 9, United States Code, Section 201." (Doc. 1 at 10). Section 201 of Title 9 provides for enforcement in United States courts of the "Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958" (the "Convention"). The Convention, in turn, provides for the recog-

---

**10.** AFG is not, of course, free to violate the High Court order in the United States. Assuming the High Court had jurisdiction over AFG and gave AFG sufficient opportunity to be heard, the High Court order does restrict conduct by AFG within the territorial limits of the United States as well as in England. *Cf.* 11 C. Wright & A. Miller, *Federal Practice & Procedure* § 2945 (1973). That is no reason, however, to intrude on the ongoing English arbitration proceedings by issuing a redundant interim American order.

**11.** Pilkington promises that it would first seek a declaration from the High Court that its injunction had been violated before seeking a sanction from this Court, but that promise only demonstrates why an order of this Court is unnecessary. The High Court is free to issue its own sanctions which, as is explained below, provide a deterrence against violations of its order.

nition of arbitration awards in the courts of signatory nations.

The High Court interim injunction is not an arbitration award entitled to recognition. "Arbitral Awards" are defined in the Convention as including "not only awards made by arbitrators appointed for each case but also those made by permanent arbitral bodies to which the parties have submitted." Convention, art. I, ¶ 2, 9 U.S.C. § 201. An ancillary injunction issued by the High Court to facilitate proceedings in a separately appointed arbitration panel is not an "arbitral award" issued by a "permanent arbitral bod[y] to which the parties have submitted." The High Court is not involved in arbitrating the substantive contract dispute between the parties and has merely exercised powers granted to it by statute to assist arbitration proceedings being conducted in other fora. Defendant is, consequently, entitled to summary judgment on Pilkington's second claim.

An order will be entered denying Pilkington's motion for a preliminary injunction and granting AFG's motion for summary judgment on both counts of Pilkington's complaint.