743 F.2d 1009
 DiRUGGIERO, Douglas C., and Douglas C. DiRuggiero as
Guardian ad Litem for Douglas DiRuggiero, Jr. and
Paul DiRuggiero
v.
RODGERS, Rebecca J., (formerly DiRuggiero), Ted Rodgers, her
husband, Gina DiRuggiero, Wendy Rodgers, Larry Thomas Black,
J. Michael Todd, T. Patrick Matus, Resa L. Harris, the
General Court of Justice of the State of North Carolina,
County of Mecklenberg, and the State of North Carolina
Appeal of Douglas C. DiRUGGIERO, Sr., Guardian ad Litem for
Douglas DiRuggiero, Jr. and Paul DiRuggiero.
 Nos. 83-5481, 83-5628.
 United States Court of Appeals,
Third Circuit.
 Argued April 5, 1984.
Decided Sept. 17, 1984.
 
 James P. Yudes (Argued), Francis X. Gavin, Mountainside, N.J., for appellants.
 George Daly (Argued), Charlotte, N.C., Mark S. Kundla, Bumgardner, Hardin & Ellis, Newark, N.J., for Rebecca J. Rodgers, Ted Rodgers, Gina DiRuggiero, Wendy Rodgers, and Larry Thomas Black.
 George W. Fisher (argued), Mason, Griffin & Pierson, Princeton, N.J., for State of North Carolina and North Carolina District Judges Todd, Matus and Harris; Rufus L. Edmisten, Atty. Gen. of N.C., Henry T. Rosser, Asst. Atty. Gen. of N.C., Raleigh, N.C., of counsel.
 Before GIBBONS and SLOVITER, Circuit Judges, and MENCER, District Judge.*
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 In Flood v. Braaten, 727 F.2d 303 (3d Cir.1984), this court held that a claim alleging noncompliance with the Parental Kidnapping Prevention Act of 1980 (PKPA)[1] arises under federal law within the meaning of 28 U.S.C. Sec. 1331 (1982). In this case we are asked to decide whether the so-called "domestic relations" exception to the diversity jurisdiction bars federal jurisdiction over a PKPA-related state-law claim for damages arising from the wrongful abduction of a child from the spouse entitled to custody. We hold that the complaint alleges a colorable claim under the PKPA. We also hold that no "domestic relations" exception to the diversity jurisdiction bars the district court's subject-matter jurisdiction over the state-law claim.
 
 I.
 
 2
 This is an action arising out of a dispute over custody of the minor children of Douglas DiRuggiero and Rebecca Rodgers. Douglas is the natural father of Douglas Jr. and Paul DiRuggiero. He brings this action on behalf of himself and as guardian ad litem for both children. The defendants include Douglas' former wife Rebecca, her current husband Ted Rodgers, Ted's daughter Wendy, Rebecca's natural daughter (and Douglas' adoptive daughter) Gina, and their counsel Larry Thomas Black (the "private-party defendants"). The complaint also names as defendants three Justices of the General Court of Justice of the State of North Carolina and the State of North Carolina itself (the "public-party defendants").
 
 A.
 
 3
 Like the facts of so many custody disputes, those before us reveal a tumultuous case history. Early in 1978 Douglas and Rebecca separated after she became involved with another man. Rebecca later established a relationship with Ted Rodgers, her current husband. During much of this time, fourteen-year-old Gina cared for the younger children. Upon learning that Rebecca and Ted intended to travel to Japan, leaving the children in several temporary homes, Douglas moved back into the house and changed the locks. After several difficult months, Rebecca sued for divorce.
 
 
 4
 On November 9, 1979, a North Carolina court awarded custody of all three children to Douglas. The order established a visitation schedule and directed that Rebecca make monthly support payments of $270.00. In December of 1981, in connection with a change of employment, Douglas and the three children moved to Summit, New Jersey. Rebecca promptly filed a motion to regain custody. On May 7, 1982, Judge Rose L. Harris of the North Carolina General Court of Justice denied that motion and established a modified visitation schedule. In part the May 7 order permitted Rebecca to visit with the children in Charlotte, North Carolina during the weekends of May 7-9 and September 10-12.
 
 
 5
 Douglas avers that he received notice of the May 7 order in New Jersey on May 10, too late to accommodate Rebecca's right to visitation in North Carolina on May 7. On May 17, Rebecca moved in North Carolina to hold Douglas in contempt for violating the May 7 visitation order. Rebecca also moved to regain custody and to terminate her child support payments. The court scheduled a hearing on these motions for June 28.
 
 
 6
 Douglas then turned to the offensive. On June 24 he instituted proceedings in New Jersey Superior Court for an order enforcing the prior North Carolina custody determinations in his favor, and for a temporary restraining order enjoining Rebecca from relitigating the custody issue in North Carolina. An affidavit attested that Rebecca had made applications in North Carolina to regain custody "every other month" since August of 1979 and that it "has become financially impossible for me to continue to deal with the North Carolina courts." App. at 86. Later that day Judge Edward T. Toy of the New Jersey Superior Court issued the requested temporary restraining order.
 
 
 7
 On July 7, 1982, the New Jersey and North Carolina courts entered inconsistent orders pertaining to custody of the children. Judge Toy of the New Jersey Superior Court concluded that New Jersey "has jurisdiction pursuant to the Uniform Child Custody [Jurisdiction] Act [UCCJA] over all issues involving the care and custody of the parties' minor children ...." App. at 90.[2] The court agreed, however, to defer to North Carolina with respect to visitation rights and Rebecca's motion to hold Douglas in contempt--provided that Rebecca would submit to the New Jersey court's jurisdiction. On the same day, Judge T. Michael Todd of the North Carolina General Court of Justice entered a conflicting order accepting jurisdiction over custody matters in North Carolina. The North Carolina order recited that "prior to assuming jurisdiction, the State of New Jersey had insufficient information provided to it by [Douglas] to enable the Presiding Judge [Toy] to evaluate the case properly before proceeding under the Uniform Child Custody Jurisdiction Act ...." App. at 92. Unless Douglas appeared on July 19 in North Carolina, the order provided, "the Court may proceed to enter such orders as are just and proper ... including, if proper, an award of custody." App. at 93.
 
 
 8
 Judges Toy of New Jersey and Todd and Patrick Matus of North Carolina later conferred by telephone in an effort to resolve the ongoing dispute over jurisdiction under the Uniform Act. In an agreement memorialized in a letter from Judge Matus to Judge Toy dated August 26, the New Jersey and North Carolina courts agreed that North Carolina would retain jurisdiction over contempt proceedings. New Jersey, in contrast, would retain jurisdiction over custody matters, but would defer any such proceedings "until the contempt hearing is completed in North Carolina." App. at 94-95.[3] If Douglas did not appear in North Carolina, however, or if he appeared, was held in contempt, and did not purge himself of contempt, then Judges Todd and Matus recommended that the New Jersey court decline to exercise jurisdiction under two provisions of the UCCJA.[4]
 
 
 9
 On September 10, 1982, without informing Douglas of her intention, Rebecca flew to New Jersey, located the children, and returned with them to North Carolina for the weekend. Rebecca attests that she called Douglas from the airport and informed him that the May 7 visitation order authorized her to visit with the children in Charlotte during the weekend of September 10-12. Although the "boys begged not to be sent back," she attested, "I obeyed the Court Order and returned them." App. at 257. Rebecca stated that she "took the foregoing actions upon the advice of my lawyer, Larry Thomas Black, that the New Jersey Court Orders then outstanding were a nullity and that the May 7, 1982 Order of the North Carolina Court authorized me to do what I did." App. at 257-58.
 
 
 10
 Thereafter matters escalated into small-scale internicene warfare. On September 15, Douglas moved for an injunction restraining Rebecca from removing the children from the State of New Jersey. He also sought an order limiting visitation to "supervised daytime visitation" and entering a default judgment on matters of custody. Douglas' affidavit asserted that Rebecca had "snatched" the children on September 10 and on several prior occasions. Before the New Jersey court ruled on these motions, however,[5] the North Carolina General Court of Justice held Douglas in criminal contempt of the May 7 visitation order. Douglas was neither present nor represented in this proceeding. Moreover, despite Judge Matus' August 26 letter agreeing that New Jersey would exercise jurisdiction over matters of custody, the North Carolina court reversed itself and held on October 4 that North Carolina had jurisdiction over all custody matters. That court ruled:
 
 
 11
 The Court has carefully considered the allegation that New Jersey had become the children's home state by virtue of the Defendant's having become a resident of the State of New Jersey for a period of six months and the Court finds said argument unpersuasive. Residence in the State of New Jersey, the Court finds, is significant to the Defendant only if this State declines its jurisdiction. The Court specifically finds that it is in the best interest of the children, under all the facts and circumstances, that jurisdiction be retained.
 
 
 12
 App. at 112. Having purported to establish its jurisdiction over custody, the court scheduled a custody hearing for October 11, 1982.[6] Douglas did not appear at this hearing. On October 20, Judge Resa L. Harris awarded custody of the children to Rebecca. That order was to become effective on November 1.
 
 
 13
 Douglas, in turn, renewed his motion before Judge Toy for an order establishing his right to custody and for an injunction restraining Rebecca from removing the children to North Carolina. Judge Toy denied that motion on October 28. See note 5 supra. Later that day, however, the New Jersey Appellate Division reversed the order of the Superior Court, directing the court to "determine the issue of jurisdiction in New Jersey" and, if jurisdiction were established, to "proceed to decide the issue of custody, visitation and other pertinent issues that are raised." App. at 149.
 
 
 14
 On October 31, 1982--one day before Rebecca was to obtain custody under Judge Harris' order, and three days after the Appellate Division had ordered Judge Toy to adjudicate issues of custody--Rebecca took possession of eleven-year-old Douglas Jr. This she accomplished by traveling to Douglas' schoolroom with Ted and Ted's daughter Wendy. Under the pretense of using a bathroom pass, Douglas left school and returned with Rebecca to North Carolina. Rebecca also sought to take custody of nine-year-old Paul. Before leaving for North Carolina, however, she learned from her counsel, Larry Thomas Black, of the October 28 order of the New Jersey Appellate Division. Black instructed Rebecca to return to North Carolina with Douglas Jr. but not to take custody of Paul.
 
 
 15
 Douglas immediately obtained an order from Judge Toy directing Rebecca to return Douglas Jr. to New Jersey. Notwithstanding this order and the October 28 order of the New Jersey court, Douglas' sister, Elise DiRuggiero, telephoned Rebecca on November 8 and stated that she would take possession of Paul and send him to North Carolina as well. Paul arrived in Charlotte later that day.
 
 
 16
 On December 6, in conformance with the order of the Appellate Division, Judge Toy held that New Jersey had jurisdiction over custody and visitation matters under the Uniform Child Custody Jurisdiction Act. Rebecca did not attend the hearing on this question. Judge Toy's December 6 order awarded custody to Douglas, concluding
 
 
 17
 that the State of New Jersey is the home state of the infants born of the marriage and has been the home state of said children since June 28, 1982, and accordingly [that] any judgments on the issue of custody from any other state thereby [are] a nullity.
 
 
 18
 App. at 176. Both children nevertheless remained in North Carolina with Rebecca.B.
 
 
 19
 On December 28, 1982, Douglas sought relief in federal court. Count I of a seven-count complaint states a claim under the Parental Kidnapping Prevention Act of 1980 (PKPA), 28 U.S.C. Sec. 1738A (1982). The PKPA count seeks a declaration that Judge Toy's December 6, 1982 order awarding custody of Douglas Jr. and Paul to Douglas is paramount over the conflicting October 20, 1982 order of Judge Harris. This count also seeks an injunction compelling Rebecca to return the children to Douglas. Count I does not seek damages. It names only Rebecca as a defendant.
 
 
 20
 Count II of the complaint asserts a claim under 42 U.S.C. Sec. 1983 against all defendants. The complaint alleges in conclusory terms that Rebecca, Ted Rodgers, Wendy Rodgers, Gina DiRuggiero, and Larry Thomas Black "at all times conspired and acted in concert with Judges Harris, Todd and Matus to deprive Douglas of custody of the children." The only allegations pertaining to conspiracy, however, aver that the private defendants acted "under color of the Order of Judge Resa L. Harris." Compl. paragraphs 4, 6, 8, App. at 16-18. The Judges themselves are alleged to have assumed jurisdiction over and to have modified the right to custody of the children in violation of the PKPA. Count II seeks compensatory and punitive damages against all defendants and an injunction compelling the return of the children to New Jersey.
 
 
 21
 Count VI of the complaint asserts a pendent state tort claim under New Jersey law for the abduction of Douglas Jr. and Paul. Jurisdiction over this claim is also predicated on diversity. The tort claim seeks money damages and, like both prior counts, injunctive relief. Among the remaining counts, count V seeks a writ of habeas corpus compelling the release of the children from Rebecca's custody. Three additional counts state claims under the privileges and immunities, due process, and equal protection clauses of the United States Constitution.
 
 
 22
 On May 26, 1983, the district court denied the private-party defendants' motion to dismiss the state tort claim insofar as it sought money damages. The court dismissed the state-law claim for injunctive relief, however, and all other claims against all parties, either for lack of jurisdiction or for failure to state a claim. Count I, the court reasoned--seeking declaratory and injunctive relief under the PKPA--does not arise under federal law within the meaning of 28 U.S.C. Sec. 1331 (1982). For the same reason, the court concluded, the count under the full faith and credit clause fails to state a claim under federal law within the meaning of section 1331.
 
 
 23
 The section 1983 claim against the private party defendants failed for lack of action under color of state law; the court reasoned that the complaint did not plead facts sufficient to establish a conspiracy between the public and private-party defendants. The court dismissed the section 1983 claim against the State of North Carolina on eleventh amendment grounds, a ruling not challenged here. The section 1983 claim against the remaining public party defendants, in contrast, fell for lack of in personam jurisdiction. The due process and equal protection claims against all parties failed for these same reasons. The court dismissed the habeas claim in count V on the authority of Lehman v. Lycoming County Children's Services Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).
 
 
 24
 As for count VI--the state tort claim--the district court dismissed the claim insofar as it sought injunctive relief, and denied the private-party defendants' motion to dismiss insofar as it sought damages, on the authority of three recent federal appellate decisions. Bennett v. Bennett, 682 F.2d 1039 (D.C.Cir.1982); Wasserman v. Wasserman, 671 F.2d 832 (4th Cir.1982); Lloyd v. Loeffler, 694 F.2d 489 (7th Cir.1982). No. 83-5481 is an appeal from that portion of the May 26 order denying injunctive relief.[7] After the plaintiffs filed this notice of appeal, the district court reversed its position on subject matter jurisdiction over the surviving damage claim and entered a final judgment for all defendants. Reasoning that an adjudication of the tort question would require litigation over issues of custody, the court concluded that the damage claim in tort under New Jersey law is prohibited by the domestic-relations exception to the diversity jurisdiction.[8] No. 83-5628 is an appeal from this final order of the district court.
 
 II.
 Subject Matter Jurisdiction Under the PKPA
 
 25
 In Flood v. Braaten, 727 F.2d 303 (3d Cir.1984), this court held that claims alleging a violation of section 1738A of the PKPA arise under federal law within the meaning of 28 U.S.C. Sec. 1331 (1982). Such claims are colorable under Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), the court held, if they allege injury caused by "the lack of consistent custody decrees," 727 F.2d at 313, one of which is entered in violation of section 1738A. We declined at that time to decide the extent to which the PKPA requires the exhaustion of state judicial remedies. Id. at 312 n. 28.
 
 
 26
 Again we need not address the exhaustion issue. The New Jersey and North Carolina courts have each entered custody decrees. These decrees award custody to different parents and are plainly inconsistent. Because the intent of the PKPA is to avoid the multiple exercise of jurisdiction over custody, one of these awards is inconsistent with the PKPA. As long as the complaint raises a colorable claim that it is the North Carolina decree that is inconsistent with federal law, the district court has subject-matter jurisdiction over count I of the complaint under section 1331.
 
 
 27
 We hold that the complaint raises a colorable claim under the PKPA. In order to make the basis for that holding clear, and to lay a predicate for our analysis of the diversity claim, we set forth our analysis in some detail. Section 1738A of the PKPA defines those conditions under which a state custody decree shall be given full faith and credit. In pertinent part that section provides:
 
 
 28
 (c) A child custody determination made by a court of a State is consistent with the provisions of this section only if--
 
 
 29
 (1) such court has jurisdiction under the law of such State; and
 
 
 30
 (2) one of the following conditions is met:
 
 
 31
 (A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;
 
 
 32
 * * *
 
 
 33
 (E) the court has continuing jurisdiction pursuant to subsection (d) of this section.
 
 
 34
 (d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.
 
 
 35
 28 U.S.C. Sec. 1738A(c), (d) (1982). We will refer to jurisdiction under subsection (A) as "home-state" jurisdiction and under subsection (E) as "continuing jurisdiction." A child's "home state," as that term is used in subsection (A),
 
 
 36
 means the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months ....
 
 
 37
 28 U.S.C. Sec. 1738A(b)(4) (1982). Thus, New Jersey became the "home state" of Douglas, Jr. and Paul six months after they began to live with Douglas in New Jersey.
 
 
 38
 The complaint alleges that "Douglas DiRuggiero, Jr. and Paul DiRuggiero became domiciliaries of the State of New Jersey on December 18, 1981 and physically began residing in the State of New Jersey on December 28, 1981." According to the complaint, therefore, New Jersey became the "home state" on either June 18 or June 28, 1982.[9] Until that time, North Carolina was the home state of the children. Consequently, the May 7, 1982 North Carolina order reaffirming Douglas' custody is prima facie valid. That conclusion requires that we examine whether the subsequent sequence of events states a colorable claim that the October 20 North Carolina decree is not in conformance with the PKPA.
 
 
 39
 The validity of the October 20 decree depends on whether North Carolina had jurisdiction under the PKPA on that date. North Carolina might have retained jurisdiction on October 20 under either of the PKPA's "home state" or "continuing jurisdiction" provisions. Under the pertinent clause of the "home state" provision, North Carolina may enter a custody decree if it is the home state of the child on "the date of the commencement of the proceeding." 28 U.S.C. Sec. 1738A(c)(2)(A) (1982). The "continuing jurisdiction" provision, in turn, provides:
 
 
 40
 The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such state remains the residence of the child or of any contestant.
 
 
 41
 28 U.S.C. Sec. 1738A(d) (1982). Requirement --a valid custody decree--is satisfied by the May 7, 1982 North Carolina decree. Requirement is satisfied because Rebecca--a contestant--remained a resident of North Carolina. Requirement specifies that subsection (c)(1) be satisfied. That subsection simply requires that the state--here North Carolina--have a valid basis for jurisdiction under state law. The only jurisdictional basis alleged under North Carolina law is N.C.Gen.Stat. 50A-3(a)(1) (Supp.1981). That section of the UCCJA is identical to section 1738A(c)(2)(A) of the PKPA; its crucial provision requires that North Carolina have been the home state "at the time of the commencement of the proceeding."
 
 
 42
 Thus, both "home state" and "continuing" jurisdiction appear to turn on a determination of the date of the commencement of North Carolina proceedings. Rebecca now urges that the "proceeding" to which these sections refer commenced on May 17, 1982, with the filing of her motion in North Carolina to modify custody. See Rodgers' Br. at 35. Rebecca filed this motion after Douglas allegedly violated the May 7 visitation order. That order permitted visitation on the weekend of May 7-10, led to contempt proceedings against him, and ultimately produced a change in custody. If the May 17 motion constituted the commencement of "the proceedings" in North Carolina, then that state had jurisdiction to modify the decree.
 
 
 43
 We are pointed to no authority dispositive of whether the filing of Rebecca's May 17 motion constituted the "commencement" of North Carolina proceedings. Cf. L.F. v. G.W.F., 183 N.J.Super. 195, 202-03, 443 A.2d 751, 754-55 (1982). The issue is troubling, for as late as August 26 the North Carolina court stipulated that New Jersey, and not North Carolina, had jurisdiction over custody matters. For the purposes of this motion to dismiss, however, we need not decide this issue. We are directed to consider only whether the complaint states a colorable claim under Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), that the North Carolina decree is inconsistent with the PKPA. The position of the North Carolina court in August of 1982 indicates that Douglas' claim is a colorable one under Bell v. Hood. The district court therefore had jurisdiction to consider it.
 
 
 44
 To summarize, Douglas' claim to custody turns on whether North Carolina proceedings commenced on May 17 under North Carolina or federal law. If they commenced at that time, then North Carolina had continuing jurisdiction over custody and visitation. If they commenced on or after June 28--the date on which New Jersey became the home state--then New Jersey had exclusive jurisdiction. Douglas' claim that North Carolina proceedings commenced later than June 28 is a colorable one. The district court therefore had jurisdiction to entertain it.
 
 III.
 
 45
 Tort of Child Abduction Under New Jersey Law
 
 
 46
 Before addressing the scope of any domestic-relations exception to the diversity jurisdiction, we must decide whether the complaint states a claim in tort under New Jersey law. Early English authorities permitted a parent to recover in tort for the abduction of a child if the parent suffered a "loss of services." See Hall v. Hollander, 4 B. & C. 660, 661-62, 107 Eng.Rep. 1206, 1206-07 (1825). In 1858 the New Jersey Supreme Court adopted the English rule, holding that "a parent's right of action for the abduction or injury of his children must be founded on the loss of their services, or for actual expenses and trouble in curing them, while minors under his roof." Magee v. Holland, 27 N.J.L. 86, 96 (1858). The court's conclusion relied in part on an analogous English doctrine requiring proof of "loss of service" in an action to recover for the seduction of a child.[10]
 
 
 47
 The doctrine requiring proof of loss of service in abduction cases met with disfavor in most jurisdictions. Many were content with an assumed "constructive" loss of services if the parents had a "right to services."[11] Other courts cut more forthrightly to the heart of the matter, concluding that the real basis for the tort is that of interference with the family relationship.[12] In the leading example of these decisions, the New York Court of Appeals held that "in actions for the abduction of immature children from the custody of their lawful custodians, parents or foster parents, no loss of service need be alleged or proven." Pickle v. Page, 252 N.Y. 474, 482, 169 N.E. 650, 653 (1930). Prosser now characterizes as the "modern view" the conclusion that loss of services "is not essential when a child has been taken from its parent." Other damages, he argues, provide a sufficient basis for the action.[13] In conformance with that view, section 700 of the Restatement (Second) of Torts now provides:One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.
 
 
 48
 Restatement (Second) of Torts Sec. 700 (1965). Loss of services, the Restatement indicates, "is not a necessary element of a cause of action." Id., comment d. Comment c to that section adds that "[o]ne parent may be liable to the other parent for the abduction of his own child if by judicial decree the sole custody of the child has been awarded to the other parent."
 
 
 49
 New Jersey has not addressed the tort of child abduction since the 1858 decision in Magee v. Holland. In the related area of the seduction of a minor, however, recent criticisms of Magee have taken hold. The New Jersey Appellate Division recently characterized loss of service as a "useful fiction." Magierowski v. Buckley, 39 N.J.Super. 534, 545, 121 A.2d 749 (App.Div.1956). In the case of seduction, loss of services is either presumed or obsolete under New Jersey law. Inasmuch as Magee relied on the seduction cases, the vitality of its holding in the area of child abduction is in doubt.
 
 
 50
 We note as well that the recent trend in other states favors recovery for the wrongful interference with a spouse's right to custody of a minor child. See McBride v. Magnuson, 282 Or. 433, 435-36, 578 P.2d 1259, 1260 (1978); Lloyd v. Loeffler, 694 F.2d 489, 493 (7th Cir.1982); Bennett v. Bennett, 682 F.2d 1039, 1042 (D.C.Cir.1982); Wasserman v. Wasserman, 671 F.2d 832, 834 (4th Cir.1982); Kajtazi v. Kajtazi, 488 F.Supp. 15, 18 (E.D.N.Y.1978); Abdul-Rahman Omar Adra v. Clift, 195 F.Supp. 857, 862 (D.C.Md.1961); cf. Schuppin v. Unification Church, 435 F.Supp. 603, 608-10 (D.Vt.1977) (no tort for inducement of adult child from home; dicta suggests that action under Sec. 700 would lie for inducement of minor child), aff'd mem., 573 F.2d 1295 (1st Cir.1977).
 
 
 51
 In light of the recent trend both in New Jersey and in other jurisdictions, we conclude that an allegation of deliberate interference with the legal right of a spouse to custody of a minor child states a claim in tort under New Jersey law. We express no opinion at this stage of the litigation on privileges or defenses that may be available under state law.[14] Thus we must consider whether any so-called "domestic relations" exception to the diversity jurisdiction affects the district court's subject-matter jurisdiction over this New Jersey claim.
 
 IV.
 
 52
 Domestic-Relations Exception to Diversity Jurisdiction
 
 
 53
 The diversity jurisdiction has roots in apprehensions of local prejudice toward foreign suitors in the state courts. See Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87, 3 L.Ed. 38 (1809).[15] Despite trenchant criticism urging that the diversity jurisdiction be pared to its essential functions--interpleader, jurisdiction over aliens, circumstances when a concrete showing of state prejudice can be made[16]--Congress has declined to place significant limitations on the statutory diversity grant.[17]
 
 
 54
 The identification of an essential core of diversity jurisdiction is of particular importance to actions arising out of interstate custody disputes. These cases truly represent one of the contemporary essential functions of the diversity grant. Here the spectre of local bias, a matter of some conjecture in 1787 and of presumptive dubiety now,[18] surfaces with unfortunate frequency. Having seen the phenomenon before, for example,[19] we are not startled that each of the state courts in this action entered decrees in favor of their local domiciliaries. Interstate custody matters also relate to the interstate arbitral function for which the federal courts are well suited.
 
 
 55
 These arguments for a federal judicial role in adjudicating the validity of competing interstate custody decrees apply to state tort actions for damages arising from wrongful custody with the same force as they apply to the disputed right to custody itself. An element of the tort, as we have noted, is the right to custody under one state's decree; a relevant defense may pertain to good-faith reliance on an opposing decree. Inconsistent damage awards in tort are therefore cognates to the inconsistent decrees themselves. It is ironic, therefore, that in this essential core of the diversity jurisdiction, we are urged to abstain from exercising jurisdiction.
 
 
 56
 The ground advanced as precluding the district court's subject matter jurisdiction is a so-called "domestic-relations" exception to the diversity jurisdiction. The domestic-relations exception originated as a dictum in Barber v. Barber, 62 U.S. (21 How.) 582, 16 L.Ed. 226 (1859). "Our first remark," the Court in Barber admonished, is
 
 
 57
 that this is not a suit asking the court for the allowance of alimony.... We disclaim altogether any jurisdiction in the courts of the United States upon the subject of divorce, or for the allowance of alimony, either as an original proceeding in chancery or as an incident to divorce a vinculo, or to one from bed and board.
 
 
 58
 Id. at 584, 16 L.Ed. 226. Not until 1930, however, did the Supreme Court squarely hold that federal jurisdiction--there the exclusive jurisdiction over matters affecting ambassadors, other public ministers, and consuls--does not extend to suits for divorce and alimony. Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 383-84, 50 S.Ct. 154, 155, 74 L.Ed. 489 (1930). This court has since held that the domestic-relations exception bars federal diversity jurisdiction over a suit to enforce a father's support obligations. Albanese v. Richter, 161 F.2d 688, 689 (3d Cir.1947); see Solomon v. Solomon, 516 F.2d 1018, 1024-25 (3d Cir.1975).
 
 
 59
 The contemporary purpose of the domestic-relations exception rests on functional considerations. An award in the first instance of divorce, alimony, child custody, visitation, or support requires the exercise of an informed discretion, discretion in which local institutions are expert and with which federal courts are unfamiliar. Such awards require continuing supervision over large numbers of cases, for which the federal courts are ill-equipped. Unlike local institutions, the federal courts are not supplemented by a professional social service staff. And on a more theoretical plane, the discretionary standards for an award of support, alimony, custody, or visitation are so amorphous and flexible that the federal courts could not predict with any confidence that their application of state law would duplicate the result that would be obtained at the state level.
 
 
 60
 These considerations are absent in interstate disputes over the validity of competing custody decrees. In that circumstance we are not asked to make an award of custody, visitation, or support in the first instance. Rather, the federal courts must ascertain which of two competing state custody awards is paramount under federal and state law. As we held in Flood v. Braaten, this determination "requires only a preliminary inquiry into jurisdictional facts." 727 F.2d at 310. Thus, the first and fourth considerations above--the local institution's expertise in applying state law, and the uncertainty of application of discretionary standards--are not applicable. Similarly, the continuing supervision appropriate to original state decrees is unnecessary in an action that bottoms on which of two states has jurisdiction to act under federal and state law. And the staff of skilled state professionals so essential to a local institution's function is similarly unnecessary in the action before us. Therefore, the purposes applicable to the diversity-abstention doctrine for original awards of custody, visitation, and support are inapplicable to interstate disputes over which of two states properly exercised jurisdiction under federal and state law.
 
 
 61
 These same arguments apply to the instant tort action. The tort claim does not require an original determination of the right to custody. Indeed, as our analysis of the PKPA makes plain, the essential question before us is when North Carolina proceedings to modify Douglas' right to custody commenced within the meaning of federal and North Carolina law. Continuing federal supervision over a custody decree is unnecessary; the professional services of a trained staff are not relevant. Finally, all other issues, including the defendants' mental state and applicable defenses, are familiar grist for the district court's application of state tort law. See Wasserman v. Wasserman, 671 F.2d 832, 834-35 (4th Cir.1982); Bennett v. Bennett, 682 F.2d 1039, 1042 (D.C.Cir.1982); Lloyd v. Loeffler, 694 F.2d 489, 492-93 (7th Cir.1982). Thus, the governing judicial standards are well-defined and capable of ready application.
 
 
 62
 Of equal importance is our observation that the resolution of disputes such as these is an essential function of the diversity jurisdiction. As we have held, the tort claim is simply a cognate to the underlying custody dispute; inconsistent custody adjudications may result in similarly inconsistent adjudications of the tort claim. Although inconsistent tort judgments predicated on disputed applications of the PKPA would raise a federal issue for the purpose of the Supreme Court's review over state court judgments,[20] it is unreasonable to expect the Supreme Court's appellate docket to be sufficiently capacious to ensure the consistent application of the PKPA in state tort actions. See Flood v. Braaten, 727 F.2d at 312. The resolution of these interstate disputes is therefore a core function of the diversity jurisdiction of the lower federal courts.[21]
 
 
 63
 For these reasons, we hold that no "domestic relations" exception to the diversity jurisdiction bars the district court's subject-matter jurisdiction in this case.V.
 
 
 64
 We must now dispose of the remaining claims raised on appeal. The state-law claim certainly appears to be one that the parties would expect to litigate in a single proceeding with the PKPA claim. Because the diversity jurisdiction supports the district court's subject-matter jurisdiction, however, we need not decide whether the state claim is also supported by the doctrine of pendent jurisdiction. The public party defendants enjoy judicial immunity to the section 1983 claim for money damages. See Stump v. Sparkman, 435 U.S. 349, 360-64, 98 S.Ct. 1099, 1106-1108, 55 L.Ed.2d 331 (1978). We agree with the district court that the averments in the complaint do not establish a conspiracy between the public party and private party defendants. See Dennis v. Sparks, 449 U.S. 24, 27-28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 150-52, 90 S.Ct. 1598, 1604-1605, 26 L.Ed.2d 142 (1970); cf. Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982). Thus, the district court properly dismissed the section 1983 claim insofar as it seeks monetary relief.
 
 
 65
 Although the public party defendants do not enjoy judicial immunity to the section 1983 claim insofar as it seeks prospective injunctive relief, Pulliam v. Allen, --- U.S. ----, 104 S.Ct. 1970, 1981, 80 L.Ed.2d 565 (1984), injunctive remedies under the PKPA against the private party defendants are evidently fully adequate to afford any relief to which the plaintiffs may be entitled. Thus, we do not reach the propriety of injunctive relief against the public party defendants, and the question of in personam jurisdiction over them. Similarly, because injunctive relief under the PKPA affords an adequate remedy, we need not address the availability of habeas corpus relief. See Lehman v. Lycoming County Children's Service Agency, 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).
 
 
 66
 The judgment of the district court in No. 83-5628 will be reversed and remanded for proceedings consistent with this opinion. The order of the district court in No. 83-5481 will be vacated and the appeal dismissed as moot.
 
 
 
 *
 Hon. Glenn E. Mencer, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Pub.L. No. 96-611, Sec. 7, 94 Stat. 3568-74 (codified at 28 U.S.C. Sec. 1738A and scattered sections of title 42)
 
 
 [2]
 New Jersey has adopted the Uniform Child Custody Jurisdiction Act. N.J.Stat.Ann. Sec. 2A:34-28 to 52 (West Supp.1983). Central to the Uniform Act is the definition of "home state" as
 the state in which the child immediately preceding the time involved lived with his parents, a parent, or a person acting as parent, for at least 6 consecutive months .... Periods of temporary absence of any of the named persons are counted as part of the 6-month or other period.
 N.J.Stat.Ann. Sec. 2A:34-30(e) (West Supp.1983).
 The Act confers jurisdiction on the New Jersey Superior Court to make a child custody determination in four circumstances:
 (1) This State (i) is the home state of the child at the time of commencement of the proceeding, or (ii) had been the child's home state within 6 months before commencement of the proceeding and the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this State; or
 (2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or
 (3) The child is physically present in this State and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected; or
 (4)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.
 N.J.Stat.Ann. Sec. 2A:34-31(a) (West Supp.1983).
 
 
 [3]
 The August 26 letter provided:
 In order to move this case along, and pursuant to our conversation, I suggest we agree as follows:
 A) New Jersey will defer to North Carolina on the contempt matter. The requirements in New Jersey's July 7, 1982 order regarding Mrs. Rodger's submission to New Jersey's jurisdiction will be deleted.
 B) North Carolina will re-open the contempt hearing and allow Mr. DiRuggiero the opportunity to come to this state and defend himself on that issue.
 C) At the re-opened contempt hearing North Carolina will not rule on the other issues (change of custody and termination of child support payments) raised by Mrs. Rodgers.
 D) New Jersey will afford full faith and credit to the last North Carolina order dated and filed May 7, 1982.
 E) New Jersey will defer proceedings and not exercise jurisdiction until the contempt hearing is completed in North Carolina.
 App. at 94-95.
 
 
 [4]
 The August 26 letter recommended that New Jersey decline jurisdiction under sections 6(a) and 8(b) of the Uniform Act. These sections authorize a state to decline jurisdiction if "a proceeding concerning the custody of the child" is pending in another state with jurisdiction under the Act and if the petitioner "has improperly removed the child from the physical custody of the person entitled to custody." See N.C.Gen.Stat. Secs. 50A-6(a), 50A-8(b) (Supp.1981); N.J.Stat.Ann. Secs. 2A:34-34, 2A:34-36(b) (West Supp.1983)
 
 
 [5]
 Judge Toy is alleged to have granted this motion orally on October 1. Compl. p 20, App. at 11. On October 28, however, he denied the motion in writing. App. at 126
 
 
 [6]
 Judge Matus explained his decision to abrogate the agreement of August 26 in a letter to Judge Toy dated October 4. This letter crossed in the mail a conflicting letter dated September 28 from Judge Toy to Judge Matus stating that the August 26 agreement "correctly states our phone understanding." App. at 108
 
 
 [7]
 We have appellate jurisdiction under 28 U.S.C. Sec. 1292(a)(1) (1982). The absence of an order disposing of all claims against all parties, see Fed.R.Civ.P. 54(b), does not impair our appellate jurisdiction under section 1292(a)(1). Lair v. Fauver, 595 F.2d 911, 912 (3d Cir.1979) (per curiam); Ransburg Electro-Coating Corp. v. Lansdale Finishers, Inc., 484 F.2d 1037, 1038 (3d Cir.1973) (per curiam)
 
 
 [8]
 Because the district court had previously dismissed the PKPA claim under federal law, the court did not consider whether the state damage claim could be supported as pendent to the PKPA count. Our disposition of these appeals makes it unnecessary to address the exercise of pendent jurisdiction
 
 
 [9]
 Because the children began to reside with Douglas on December 28, 1981, New Jersey clearly had become the home state by June 28, 1982. Courts have held, however, that jurisdiction under the UCCJA can be established by either domicile or residence of the child. E.g., In re Sagan, 261 Pa.Super. 384, 387-88, 396 A.2d 450, 452 (1978). If the same interpretation is accorded to the PKPA, and if the domicile of the children was the same as that of Douglas in December of 1981, then New Jersey became the home state as early as June 18, 1982. This distinction is not material to our disposition of these appeals
 
 
 [10]
 See Grinnell v. Wells, 7 Man. & G. 1033, 1041, 135 Eng.Rep. 419, 423 (1844); Eager v. Grimwood, 1 Exch. 61, 63-64, 154 Eng.Rep. 26, 27 (1847)
 
 
 [11]
 E.g., Washburn v. Abrams, 122 Ky. 53, 55-56, 90 S.W. 997, 997-98 (1906); Hare v. Dean, 90 Me. 308, 312-13, 38 A. 227, 228 (1897)
 
 
 [12]
 See Howell v. Howell, 162 N.C. 283, 286-87, 78 S.E. 222, 224 (1914)
 
 
 [13]
 W. Prosser, Law of Torts Sec. 124, at 883 (4th ed. 1971)
 
 
 [14]
 In particular, we express no opinion on the relevance of good-faith reliance on a foreign, unlawful custody decree
 
 
 [15]
 See also Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 347, 4 L.Ed. 97 (1816); Erie R.R. v. Tompkins, 304 U.S. 64, 74, 58 S.Ct. 817, 820, 82 L.Ed. 1188 (1938); Guaranty Trust Co. v. York, 326 U.S. 99, 111, 65 S.Ct. 1464, 1471, 89 L.Ed. 2079 (1945)
 
 
 [16]
 See Currie, The Federal Courts and the American Law Institute, Part I, 36 U.Chi.L.Rev. 1, 8 (1968); Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp.Prob. 216, 234-40 (1948)
 
 
 [17]
 Cf. 28 U.S.C. Secs. 1330(a), 1332(a)(4) (1982) (limiting diversity jurisdiction over actions against foreign states); 28 U.S.C. Sec. 1332(c) (1982) (causing incomplete diversity between citizens of a state and foreign corporations with principal place of business in the same state, and with foreign insurers with insureds in the same state). But see 28 U.S.C. Sec. 1332(d) (1982) (extending diversity jurisdiction to territories and District of Columbia)
 
 
 [18]
 The extent of local prejudice against foreign suitors at the time of the adoption of the Constitution has been doubted. See Friendly, The Historic Basis of Diversity Jurisdiction, 41 Harv.L.Rev. 483, 493-95 (1928). The existence of such prejudice today is greeted with greater skepticism. See Currie, supra note 15, 36 U.Chi.L.Rev. at 7
 
 
 [19]
 Flood v. Braaten, 727 F.2d 303 (3d Cir.1984); Bennett v. Bennett, 682 F.2d 1039 (D.C.Cir.1982)
 
 
 [20]
 28 U.S.C. Sec. 1257 (1982); see Moore v. Chesapeake & O. Ry., 291 U.S. 205, 214, 54 S.Ct. 402, 405, 78 L.Ed. 755 (1934) (issue of state law incorporating federal law by reference appealable to Supreme Court from state courts); Green, Hybrid State Law in the Federal Courts, 83 Harv.L.Rev. 289, 292-319 (1969); Note, The Theory of Protective Jurisdiction, 57 N.Y.U.L.Rev. 933, 946 (1982)
 
 
 [21]
 Of course, Congress could confer arising-under jurisdiction over state tort actions in which an interpretation of the PKPA is in dispute. At present, the "Holmes' test" indicates that such actions do not arise under federal law within the meaning of section 1331. See American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987 (1916) (Holmes, J.) (suit arises under the law that creates the cause of action)
 Similarly, it seems evident that Congress could confer so-called "protective" arising-under jurisdiction over interstate custody disputes involving disputed interpretations of the UCCJA. See Note, The Theory of Protective Jurisdiction, supra note 19, 57 N.Y.U.L.Rev. at 947-59; cf. Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 103 S.Ct. 1962, 1970 n. 17, 76 L.Ed.2d 81 (1983). These disputes represent classic forum-based concerns with which protective jurisdiction is concerned.
 In the absence of such arising-under jurisdiction, however, interstate custody disputes remain at the core of functions suited to the diversity jurisdiction.